IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

| | |
|---|---|
| SUSAN SPITALNIK, | |
| Plaintiff. | Case No. _____ |
| v. | |
| MCKINSEY AND COMPANY, INC., | |
| Defendant. | |

## COMPLAINT

Susan Spitalnik ("Ms. Spitalnik"), by and through her attorneys, Katz Banks Kumin and Matt Singer Law, LLC, files this Complaint against Defendant McKinsey and Company, Inc. ("McKinsey" or "Defendant"). Ms. Spitalnik brings this Complaint for injuries she sustained after McKinsey took adverse employment actions— including demoting her and terminating her employment— following the birth and tragic death of her daughter, Sara Rose.

## INTRODUCTION

1.     In early 2023, Susan Spitalnik was on the verge of achieving two long-held aspirations: becoming a partner at McKinsey and growing her family. For years Ms. Spitalnik had been working as a Solution Leader in the McKinsey Academy business unit, where she built innovative programs that brought in seven figures in revenue, earned the trust and confidence of her manager, colleagues, and

1

clients, and received consistently strong performance reviews. Her manager informed her that she was on track for promotion to Associate Partner.

2.      Around the same time that Ms. Spitalnik was trending toward partnership, she learned that she was pregnant, due on October 19, 2023. She hoped that this news would be met with respect and understanding, but she was apprehensive about how her managers at McKinsey might respond to the news; she had seen the Company sideline or lay off other pregnant women and new mothers in the past.

3.      Ms. Spitalnik had a difficult pregnancy from the start and required protected medical leave for severe pregnancy-related complications starting in April 2023, only 3 months into her pregnancy.

4.      On July 3, 2023, less than 24 weeks into her pregnancy, Ms. Spitalnik was hospitalized. Days later, she gave birth to a daughter, Sara Rose, on July 9, 2023.

5.      On July 24, 2023, after Ms. Spitalnik had spent three weeks in and out of the NICU and working toward her own recovery from childbirth, Sara Rose tragically died.

6.      Ms. Spitalnik reasonably expected McKinsey to respond with compassion and understanding. But the opposite occurred.

7.      Within weeks of learning of Sara Rose's death, McKinsey revoked Ms. Spitalnik's Company-funded paid parental leave and pressured her to return to work by September 2023. When Ms. Spitalnik indicated that she would require

additional leave to recover from the birth and death of her child, McKinsey told her to apply for short term disability — forcing her to navigate a bureaucratic morass as she grieved.

8.      Then, approximately a month after Ms. Spitalnik applied for short-term disability benefits, McKinsey Partner Mark Metakis informed Ms. Spitalnik that she was being demoted and removed from partnership track.  Ms. Spitalnik questioned the decision.  She stated that it seemed like she was being given a disadvantaged role (aka demotion) because her daughter had died, and she had taken leave.  Metakis replied that Ms. Spitalnik simply did not understand the "nuance" of the situation.

9.      The demotion — on top of the loss of her child — caused Ms. Spitalnik profound emotional distress.

10.     On May 30, 2024, she filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") — which was cross filed with the Illinois Department of Human Rights ("IDHR") — accusing McKinsey of discriminating against her on account of her sex, pregnancy, and disability and retaliating against her.

11.     On June 18, 2024, McKinsey's Human Resources representative told Ms. Spitalnik that McKinsey could not hold her position open for much longer — implying that she had to return to work soon or be terminated.

12.     After requesting, and eventually receiving, a workplace accommodation, Ms. Spitalnik returned to work on September 6, 2024.  Upon her

return, she was sidelined and isolated. The Company's message to Ms. Spitalnik was clear: now that she had a disability, taken medical leave, given birth, grieved her child's death, and accused McKinsey of discriminating and retaliating against her, her once-meaningful career at McKinsey was over.

13.     On May 9, 2025, Ms. Spitalnik filed another charge with the EEOC adding additional acts of discrimination and retaliation she had faced upon her return to work.

14.     Two months later, on July 9, 2025, which would have been Sara Rose's second birthday, McKinsey terminated her employment.

## JURISDICTION AND VENUE

15.     Ms. Spitalnik's federal claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended, the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq.*, ("FMLA"), the Pregnant Workers Fairness Act, 42 U.S.C. § 2000gg ("PWFA"), and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et. seq.* ("ADA"). This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. Ms. Spitalnik's state law claims arise under the Illinois Human Rights Act, 775 ILCS 5/2-101 *et. seq,* ("IHRA"), and common law. This Court has supplemental jurisdiction over Ms. Spitalnik's state-law claims pursuant to 28 U.S.C. § 1367.

16.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to this case occurred in this district.

4

## PARTIES

17.    Susan Spitalnik is a woman who worked for McKinsey between August 2013 and July 2025.  She resides in this judicial district.  Ms. Spitalnik became pregnant in 2023, gave birth, and experienced ongoing disabilities related to her pregnancy, her daughter's death, and workplace discrimination.

18.    Defendant McKinsey is a world-renowned international consulting firm.  It operates out of more than 100 offices located in 65 countries and employes approximately 1,000 employees in the Chicago office, where Ms. Spitalnik was based. In 2024, McKinsey earned more than $16 billion in revenue.

## ADMINISTRATIVE PROCEDURES

19.    Ms. Spitalnik has exhausted her administrative remedies by timely filing complaints with the EEOC against Defendant alleging violations under Title VII, the ADA, and the PWFA on May 30, 2024, and May 9, 2025.

20.    She received her Right to Sue Notice from the EEOC on April 30, 2025, with respect to her May 30, 2024, filing, and is filing this action within 90 days of receipt of her Right to Sue Notice.

21.    Subsequent to the filing of this Complaint, Ms. Spitalnik will amend her charge filed with the EEOC on May 9, 2025, to add additional adverse acts, including her termination, and request a Right to Sue on the May 9, 2025, charge.

22.    Ms. Spitalnik's charges with the EEOC were automatically cross-filed with the IDHR pursuant to its worksharing agreement with the EEOC.  775 ILCS

5/7A-102(A-1)(1).  On May 20, 2025, Ms. Spitalnik timely notified the IDRH that the EEOC had issued a Right to Sue Notice on her charge filed on May 30, 2024, and requested to opt out of the IDHR investigation.  Ms. Spitalnik is awaiting a Notice of Dismissal and Closure from the IDHR as of the date of this Complaint.

23.    Ms. Spitalnik intends to amend this Complaint to add additional claims when she receives the Right-to-Sue notice from the EEOC and the Notice of Dismissal and Closure from the IDHR.

## FACTUAL ALLEGATIONS

### *Ms. Spitalnik Performs Outstandingly and is Told She is on Track for Promotion.*

24.    Ms. Spitalnik joined McKinsey in late August 2013 as a General Associate in McKinsey's Chicago Office following her graduation from the University of Chicago Booth School of Business.

25.    She thrived in this role, and as is relevant here, was promoted to a Solution Leader position within McKinsey Academy in 2019.  This was a Partner track position.

26.    McKinsey Academy is a business unit within McKinsey dedicated to designing, marketing, and selling elite training to McKinsey's clients.

27.    Ms. Spitalnik excelled in her role as a Solution Leader.  McKinsey regularly and formally recognized Ms. Spitalnik's strong performance with positive performance ratings of 3 or above on a scale of 1 to 5.  She received regular raises and bonuses.

6

28.     In her Solution Leader role, Ms. Spitalnik developed two training curriculums, Agile Foundations and LEAP, designed to teach business leaders and executives efficiency and collaboration skills.  She devoted years of effort to designing, developing, building, implementing, and selling these programs internally to McKinsey partners and practice leaders and externally to clients.

29.     These high-margin, effective, and efficient programs were extremely successful under Ms. Spitalnik's leadership.  In 2022, Agile Foundations and LEAP generated over $1.5 million in revenue and were on track to bring in over $2 million in revenue in 2023.

30.     In early 2023, in recognition of Ms. Spitalnik's talent, successes and contributions, her manager, Senior Asset Leader and Associate Partner Naveed Rashid, confirmed in a video call that Ms. Spitalnik was on track to make Associate Partner by mid-2024.

### After Ms. Spitalnik Announces Her Pregnancy, Suffers Severe Complications, and Takes Protected Medical Leave, McKinsey Dead-ends Her Career.

31.     In early 2023, Ms. Spitalnik learned that she was pregnant.

32.     She was excited to grow her family but was afraid of how it might affect her career.  While McKinsey touts itself as supportive of working mothers, Ms. Spitalnik had witnessed several women be sidelined after having children.

33.     For example, around the time Ms. Spitalnik learned that she was pregnant, a female employee in Ms. Spitalnik's group, SF, went on early disability leave due to pregnancy-related medical issues.  Though SF had been a high performer in line for a promotion, Rashid declined to recommend her for a

promotion after she went on leave. Based on Rashid's non-recommendation, McKinsey declined to promote her. Seeing that she had no future within the McKinsey Academy, SF left the Academy and transferred to another department.

34. Similarly, Ms. Spitalnik was also aware that Rashid had recommended removing position funding for AM, another female employee in Ms. Spitalnik's group, while she was out on parental leave. The net effect of Rashid's recommendation was that there was no financial support for AM's position, leading to its elimination. When Ms. Spitalnik questioned Rashid's recommendation for not including AM's position in the FY 2023 budget, Rashid stated that AM "would not want to work after giving birth" and that if she did, it would be part-time or in a different department or words to that effect. Ms. Spitalnik asked Rashid if he was sure that AM did not want to come back to work for McKinsey; Rashid responded that this was what he "thought."

35. In March 2023, Ms. Spitalnik notified Rashid that she was pregnant, due on October 19, 2023.

36. Shortly after this disclosure, in April 2023, Ms. Spitalnik began experiencing severe pregnancy-related conditions, including migraines, infections, and high-blood pressure spikes, for which she was eventually hospitalized.

37. Ms. Spitalnik's healthcare provider recommended that she go on medical leave for these pregnancy-related complications.

8

38.     She applied for leave under the Family Medical Leave Act (FMLA). McKinsey approved Ms. Spitalnik's leave, retroactive to late April 26, 2023, through September 28, 2023.

39.     Ms. Spitalnik's severe pregnancy-related symptoms continued to be disabling throughout June.

40.     On June 9, 2023, Ms. Spitalnik informed Rashid of these ongoing severe pregnancy complications and requested an accommodation of additional medical leave through the end of her pregnancy, to return at the conclusion of her parental leave.  Rashid approved the request.

41.     Rashid did not indicate at this time who would temporarily cover Ms. Spitalnik's assets while she was out on leave.  However, she assumed her position would be temporarily filled by non-Academy McKinsey consultants, as was standard practice.

### Ms. Spitalnik's Baby Dies, and McKinsey Denies Her Parental Leave and Tells Her to Return to Work.

42.     One month after her request to extend her leave, on July 9, 2023, Ms. Spitalnik went into premature labor and gave birth to her daughter, Sara Rose.

43.     Sara Rose was born more than three months premature. She was in critical condition and immediately moved to the neonatal intensive care unit (NICU).

44.     Ms. Spitalnik remained in the hospital for days recovering from childbirth and caring for her baby daughter as she struggled to survive.

45.     On July 17, 2023, Ms. Spitalnik notified McKinsey of her daughter's premature birth.

46.     On July 18, 2023, McKinsey's human resources representative Charlotte Nielsen emailed Ms. Spitalnik information regarding McKinsey's parental leave policies.  (A copy of the documents provided are attached as Exhibit A.)  The policies allowed for up to 26 weeks of leave for a child's birth, including 11 weeks of self-funded parental leave paid for by McKinsey, plus five weeks of PTO (paid time off) provided by McKinsey, regardless of an employee's current PTO balance. In addition, McKinsey also offered up to four weeks of paid "special birth leave" for any time a baby may be required to stay in the hospital.

47.     McKinsey's parental leave benefits policy contained no conditions regarding how a person who gave birth spent their time on leave, rather, an employee qualified "following the birth" of a child.

48.     Based on the information contained in McKinsey's July 18, 2023, email, Ms. Spitalnik understood she would receive paid parental leave through January 19, 2024, with additional special birth leave if she needed it.

49.     Ms. Spitalnik was relieved to hear that she would have time to recover from her pregnancy and childbirth and to care for and bond with Sara Rose.  This was especially important, as Sara Rose's condition remained critical.

50.     On July 24, 2023, after 15 days spent in the NICU, Sara Rose died. The death of Sara Rose caused Ms. Spitalnik immeasurable distress.

10

51.     Shortly after Ms. Spitalnik informed McKinsey of Sara Rose's death, Nielsen emailed Ms. Spitalnik and told her that she was expected to return to work by September.  No explanation was provided for this request or change to Ms. Spitalnik's planned leave.  Ms. Spitalnik asked Nielsen for a call.

52.     On August 28, 2023, Ms. Spitalnik and Nielsen spoke by phone, at which time Nielsen informed Ms. Spitalnik that McKinsey would no longer provide Ms. Spitalnik with the 11 weeks of self-funded parental leave paid for by McKinsey with the option to extend leave by 5 weeks using PTO or unpaid leave.  Nielsen further stated that if Ms. Spitalnik was not able to return to work in the immediate term, she would have to apply for short-term disability leave and benefits.

53.     Ms. Spitalnik was confused and overwhelmed.  She had difficulty processing the news that her paid leave benefits were being cut, and worried about her future financial stability.  Being forced to navigate the short-term disability process on top of the traumas she had already suffered also exacerbated her anxiety and overwhelmed her.

54.     Ms. Spitalnik's provider diagnosed Ms. Spitalnik with acute stress disorder.  Ms. Spitalnik applied for short-term disability benefits in or around September 2023.

55.     While Ms. Spitalnik started to receive short-term disability benefits, no one from McKinsey or its insurance provider told her whether she had been approved for the leave for several months.  This caused additional anxiety for her

11

because in the event McKinsey and/or the provider denied the claim, she would be forced to repay the short-term disability benefits received to date.

### *McKinsey Demotes Ms. Spitalnik During Her Disability Leave.*

56.     In early fall of 2023, while Ms. Spitalnik was still out on leave, McKinsey internally announced changes to the "Solution Leader" role which Ms. Spitalnik then held.

57.     The planned changes included transitioning almost all of the Solution Leaders into a new role: Asset Leader.  Asset Leaders were to have the same responsibilities, promotion opportunities (including partner tracking), and prestige as current Solution Leaders.

58.     Solution Leaders not selected for an Asset Leader role were to remain in the Solution Leader role, which post-reorganization, would be changed to something more akin to the former Solution Associate position.  This position would no longer be a Partner track role, making it a demotion—a change with significant professional and financial disadvantages for employees relegated to that role, like Ms. Spitalnik who had been on the cusp of promotion.

59.     McKinsey planned to stop hiring into the Solution Leader role, with the goal of allowing the position to "sunset", *i.e.* eliminated.

60.     The number of Asset Leader roles created in this reorganization were tied to the financial performance of a given asset.  Accordingly, the more revenue that an asset generated, the more Asset Leader roles created for that asset.

61.     At the time of this reorganization, there were 12 Solution Leaders responsible for 17 assets.

62.     At the time of the reorganization, Ms. Spitalnik ranked in the top 5 out of 12 Solution Leaders in terms of total revenue generated through her two assets.

63.     At the time of the reorganization, Ms. Spitalnik's individual assets – Agile Foundations and LEAP – were the 8th and 12th highest revenue producing assets out of 17 within the Academy.

64.     As part of the reorganization, McKinsey created ten (10) Asset Leader roles, meaning ten (10) Solution Leaders would be elevated to Asset Leader and two (2) Solution Leaders would remain in the role.

65.     On October 20, 2023, while Ms. Spitalnik was still on leave, Marc Metakis, McKinsey Partner and Academy Co-lead, informed Ms. Spitalnik of the upcoming reorganization and stated that she had not been selected for an Asset Leader position and instead would remain in the new Solution Leader role.  Metakis claimed that she still "had her role", just with an additional 45 percent utilization requirement.

66.     This news shocked Ms. Spitalnik.  She had consistently met or exceeded expectations and had built two high performing assets.  She could not understand why she was not selected for an Asset Leader role.  She also disagreed with Metakis' assertion that the new Solution Leader role was her same role; it was no longer a Partner track position and, according to Metakis, had a 45 percent utilization target.  This meant that Ms. Spitalnik had to spend at least 45 percent of

her time on billable work— which was time she could no longer spend rebuilding her portfolio.

67.     Ms. Spitalnik became visibly upset; she asked Metakis how the selection was made.

68.     Metakis responded that the decision was "revenue based" and that factors such as performance were not considered.

69.     Ms. Spitalnik protested that Metakis' explanation did not make sense; the revenue generated from her assets — both combined and individually— exceeded that of several Solution Leaders who were transitioned to Asset Leader positions.

70.     Metakis provided no other justification and again said the decision was "revenue based."

71.     Shocked, Ms. Spitalnik stated: "from where I'm sitting, it looks like I was given a disadvantaged role (aka demotion) because I had been out with a serious health condition, and my daughter died."

72.     Metakis appeared caught off guard and blurted that Ms. Spitalnik was demoted because, after McKinsey had assigned her LEAP program to a fellow Solution Leader Tom Wintering, his assets (including LEAP) were, together, more profitable than Ms. Spitalnik's remaining asset (Agile Foundation).

73.     Ms. Spitalnik was again shocked.  She had heard rumors that Mr. Wintering was managing LEAP, but this was the first she had formally heard that McKinsey had given LEAP to Mr. Wintering while she had been on leave.

14

74. She also was dumbfounded that McKinsey was using the fact that one of her assets had been given to Wintering *because she had to take leave* as a basis for denying her a role as Asset Leader. It felt patently discriminatory, and she expressed as much to Metakis, stating that it felt as if McKinsey "took a big part of my portfolio away while I was out on protected disability leave, gave it to someone else, and then used that against me when making these decisions."

75. Metakis responded in a demeaning manner, telling Ms. Spitalnik that she clearly was not grasping the "nuance" of the situation. He did not explain what nuances these were.

76. Of the 12 Solution Leaders, only Ms. Spitalnik and Mariano Barrera were kept in Solution Leader roles.

77. Barrera had one asset that had generated less than $400,000 as of September 1, 2023.

78. Ms. Spitalnik had two assets with combined revenue in excess of $1,000,000 as of September 1, 2023, and over $700,000 and $350,000, individually during the same time period.

79. Barrera's sole asset was among the least productive in the Academy. Ms. Spitalnik ranked in the top 5 out of 12 Solution Leaders in terms of total revenue. Her individual assets – Agile Foundations and LEAP – were the 8th and 12th highest revenue producing assets out of 17 within the Academy.

80. Ms. Spitalnik was devastated by this conversation. She had dedicated over a decade of her life to supporting McKinsey and its work, and now she was

being sidelined into a dead-end demoted role because of her leave and/or assumptions that she was – or would be – unable to do the work due to her actual or perceived disabilities and/or sex.

### *Ms. Spitalnik Seeks to Protect Her Job as Her Health Declines.*

81.     Still reeling from the trauma of her pregnancy and the loss of her daughter, McKinsey's unjustifiable decision to demote her caused Ms. Spitalnik's mental health to decline further.  She experienced heightened levels of stress, anxiety, and self-doubt, and experienced new symptoms and challenges, including episodes of dissociation, forgetfulness, and difficulty with concentration and focus. She forgot friends' names and faces, she struggled with simple tasks like cashing checks, and she found herself in locations with no memory of how she had gotten there.

82.     To cope, Ms. Spitalnik was forced to use her therapy appointments, scheduled to help her process her traumatic pregnancy and loss of her daughter, to instead address the impact of McKinsey's decision to demote her.

83.     Ms. Spitalnik was subsequently diagnosed with post-traumatic stress disorder, caused by the trauma associated with the death of her daughter, her demotion, and subsequent interactions with McKinsey.

84.     Due to these mental health conditions, Ms. Spitalnik continued to require leave as an accommodation for her disabilities.

85.     In late October 2023, Ms. Spitalnik's short-term disability leave, and benefits expired, while she continued to suffer from severe mental health challenges

16

which limited her ability to perform major life activities. She therefore filed for
(partially paid) long-term disability benefits with McKinsey.

86. She struggled to navigate this complex process and told Nielsen on
more than one occasion that she was struggling with cognitive difficulties and asked
for help navigating the process. McKinsey provided no meaningful assistance.

87. As with Ms. Spitalnik's short-term disability – for which she still had
not received notice of approval as of November 2023 – Ms. Spitalnik did not receive
any notification of approval of her long-term disability request or any payment from
McKinsey's contracted third-party insurance provider for nearly three months after
she submitted the application, deepening her anxiety around her job and financial
security.

88. On January 23, 2024, Ms. Spitalnik, through counsel, notified
McKinsey's General Counsel of concerns that McKinsey was discriminating against
and retaliating against her on the basis of pregnancy, disability, and leave.

89. This same day, January 23, 2024, Ms. Spitalnik received notice from
McKinsey's contractor notifying her that her short-term disability benefits were
approved from September 18, 2023, through October 24, 2023.

90. The next day, January 24, 2024, Ms. Spitalnik received notice that her
long-term disability benefits had been approved – nearly three months after she had
applied for them.

91. The timing of these approvals, sent months after Ms. Spitalnik had
made the request and only in the immediate aftermath of threats of legal action,

17

highlighted the disregard with which McKinsey had approached Ms. Spitalnik and her situation.

### *Ms. Spitalnik Begins to Recover, Files an EEOC Charge, and Faces Escalating Discrimination and Retaliation.*

92. Ms. Spitalnik continued to be on leave for her disabilities through the end of 2023 and into the beginning of 2024.

93. On May 30, 2024, Spitalnik filed a charge of discrimination with the EEOC, cross filed with the IDHR, accusing McKinsey of discriminating against her on account of her sex, her pregnancy, and her disability, and retaliating against her.

94. On June 18, 2024, Ms. Spitalnik spoke with Nielsen about her return-to-work plans. She informed Nielsen that her physician had determined that she could return to work in August or September 2024. She also told Nielsen that she needed temporary workplace accommodation due to her ongoing mental health conditions.

95. Nielsen told Ms. Spitalnik that McKinsey could not hold her position open for much longer. Ms. Spitalnik and Nielsen spoke again and asked if she could return to work after July 24, 2024, the one-year anniversary of Sara Rose's death. Nielsen agreed but said Ms. Spitalnik had to return to work no later than the first week of August 2024.

96. Feeling as if she had no choice, Ms. Spitalnik agreed to this plan. She thereafter informed the long-term disability provider that she was to start working the first week of August 2024.

97.    Ms. Spitalnik prepared to return to her position.  In consultation with her physician, she assembled a list of proposed reasonable accommodations and sent them to Nielsen on or around July 22, 2024, for review and approval.

98.    Two days later, on July 24, 2024, Ms. Spitalnik's long term-term disability provider cut off her disability benefits, based on her representation that she was to return to work the first week of August 2024, as per Nielsen's directive.

99.    Nielsen did not respond to Ms. Spitalnik's accommodation request for days, prompting Ms. Spitalnik to email Nielsen for an update on her reasonable accommodation request on July 30, 2024.

100.    Nielsen did not respond until August 1, 2024, at which time she simply acknowledged that the Company was to blame for the delay since no one from McKinsey had responded to her request.  She did not provide any further clarification regarding Ms. Spitalnik's proposed accommodation request.

101.    On August 2, 2024, Ms. Spitalnik told Nielsen that she was prepared to start work on August 7, subject to McKinsey providing her guidance on her proposed accommodation.

102.    Nielsen replied that Ms. Spitalnik had to fill out more paperwork for McKinsey to even consider her accommodation request.  This was the first time she had mentioned this additional paperwork, even though Ms. Spitalnik had told Nielsen a month and a half earlier she required accommodations to return to work. Nielsen told Ms. Spitalnik she could not return to work until her providers submitted the requested paperwork.

103.     This entire series of events caused Ms. Spitalnik significant stress.  By this point, she was no longer receiving long-term disability payments, since she had notified the provider of her plan to return to work by early August.  She also worried what was going to happen when she did not return to work by August 7, 2024, as Nielsen had suggested she may be fired if she did not do so.

104.     Ms. Spitalnik immediately worked to have her provider fill out the requested information and submit it.  Nonetheless, McKinsey did not notify Ms. Spitalnik that it approved of her accommodation request until August 28, 2024, over a month after she had first requested it.

105.     Ms. Spitalnik returned to work on September 6, 2024, with reasonable accommodations for her disabilities, after being without income for over a month because of McKinsey's inexplicable delays in processing and responding to her accommodation request.

*Ms. Spitalnik Returns to Work and Faces Retaliation.*

106.     On her first day back at work, and for a period of time thereafter, Ms. Spitalnik was unable to access the McKinsey internal network due to a "legal" hold on her laptop, making it difficult to communicate with others.

107.     Meanwhile, while Ms. Spitalnik tried to obtain the basic tools needed to do her job, she met with colleagues to orient herself to her new role.

108.     Among those she met with was John Leroi, a Senior Manager of Professional Development at McKinsey, who informed Ms. Spitalnik that no legacy Solution Leader who had attempted to satisfy both the 45% client utilization target

and manage the pre-existing Solution Leader requirements had succeeded. He suggested that Ms. Spitalnik elect to satisfy only half of the Solution Leader responsibilities: either dedicate herself to the pre-existing requirements, or identifying new client work, not both.

109. This conversation confirmed Ms. Spitalnik's fears that her demoted role was a dead end. It also confused Ms. Spitalnik as to how she was to proceed. Her job duties had two required components, yet Leroi suggested that she should only try to satisfy one or the other but not both.

110. Troubled, and wanting to succeed in her job, Ms. Spitalnik then met with Metakis, who echoed Leroi's statement that Ms. Spitalnik could not be successful if she attempted to complete all the major components of her Solution Leader job description.

111. Subsequently, on September 17, 2024, Ms. Spitalnik met with Rashid, who only confused things further when he said that there was not sufficient work for Ms. Spitalnik to perform in her new role and suggested that she look for a new position at the Company.

112. Despite this conflicting direction, and lack of access to the internal network, Ms. Spitalnik did her best to reintegrate into her role and perform her job well.

113. On October 22, 2024, as was forecast, McKinsey sent an email to all Academy employees stating that the Solution Leader position, Ms. Spitalnik's position, was going to be eliminated in the coming year.

114. This news only deepened Ms. Spitalnik's concerns about her job security, but as was her nature, she remained committed to the job and continued to perform her job duties to the best of her abilities.

### *Ms. Spitalnik is Siloed into Another Dead-End Role.*

115. In or around January 2025, Metakis told Ms. Spitalnik that there would soon be an opening for the Growth Marketing and Sales Asset Leader role and asked her whether she would like to assume it.

116. While Ms. Spitalnik wanted to move out of her dead-end Solution Leader role, she had concerns that the future of the Growth Marketing and Sales Asset Leader role was not bright, either.

117. The Growth Marketing and Sales Asset Leader role supported an asset created only a few years prior, served fewer than 50 clients, had three consecutive years of declining revenue, and had projected revenues of only $1.5 million for 2025 — below the typical threshold for consideration for Associate Partner.

118. Further, a careful review of the expectations and financial targets for the role indicated that the targets were impossible to meet and that the position was structurally set up to fail.

119. Worried that she was once again being siloed into a dead-end role, Ms. Spitalnik raised concerns about the viability of the position with Metakis and others, including by email to Metakis, Rashid, Leroi and others on January 24, 2025. Among other things, she wrote: "To be frank, this position, as currently structured, appears to be a dead-end role, similar to the one that I was left in while

22

I was on disability leave and which I hold now." Ms. Spitalnik wrote that being offered this specific role, with its unreasonably demanding targets, "feels like it might be discriminatory and/or retaliatory in nature."

120. While Metakis initially agreed to make some changes to the cost basis of the asset to improve chances of achieving financial targets, the role continued to be structurally flawed. Despite this, Metakis conveyed to Ms. Spitalnik she could either take the role that was offered or nothing. Thus, after further discussions with leadership, and given that her current Solution Leader position was going to be eliminated, Spitalnik agreed to take on the Asset Leader role offered.

121. In the immediate aftermath of being forced to take this undesirable role, Ms. Spitalnik learned that there was another, superior asset leader role that had been available at the same time, but was not offered to her, despite her qualifications: the Organizational Health Index Asset Leader role. This role supported an asset that had been established for more than two decades, had served over 2,600 clients, and generated well more than $10 million in annual revenue. It, unlike the Growth Marketing and Sales Asset leader role, was not structurally flawed and would have put Ms. Spitalnik back on her once lost Partnership track.

122. McKinsey hired a man who, based on information and belief, had not been on protected medical leave and/or suffered from a disability for the Organizational Health Index Asset Leader role.

123. Despite these challenges, Ms. Spitalnik continued to perform well in her new asset leader role.

23

### *Ms. Spitalnik Files Another EEOC Charge; McKinsey Fires Her.*

124.    On May 9, 2025, Ms. Spitalnik filed a second EEOC charge, addressing the discriminatory and retaliatory actions that had taken place after the filing of her first charge.

125.    Two months later, on July 9, 2025— on what would have been Sara Rose's second birthday—McKinsey fired Ms. Spitalnik via email as part of an alleged reorganization.

126.    McKinsey attached to the termination email an Older Workers Benefit Protection Act disclosure, which showed that Ms. Spitalnik was only one of two individuals targeted by the purported layoff that resulted in her termination.  Ms. Spitalnik was the only Asset Leader terminated.

127.    The Organizational Health Index Asset Leader position was not eliminated.  The man who was selected for this role remains employed by McKinsey.

128.    As a direct and proximate result of Defendant's conduct, Ms. Spitalnik has suffered wage and financial losses and damage to her career.  She worries that it will take years for her to find or work her way up to a position similar in level to the one she held before she took medical leave for her pregnancy.

129.    As a direct and proximate result of Defendant's conduct, Ms. Spitalnik has suffered severe emotional and mental distress, loss of reputation, embarrassment and humiliation, loss of enjoyment of life, inconvenience, and other

non-pecuniary losses. McKinsey further destabilized Ms. Spitalnik's life as she was mourning her baby daughter's death, leaving her family life and career both in ruins.

130. Defendant acted with malice and reckless indifference to Ms. Spitalnik's rights.

## COUNT I
## SEX/PREGNANCY DISCRIMINATION IN VIOLATION OF TITLE VII

131. Ms. Spitalnik realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

132. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended, makes it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

133. The Pregnancy Discrimination Act amended Title VII to clarify that the terms "because of sex" or "on the basis of sex" under Title VII include "because of or on the basis of pregnancy, childbirth, or related medical conditions" and make clear that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected by similar in their ability or inability to work." 42 U.S.C. § 2000e(k).

134. At all times relevant to this Complaint, Defendant was a person engaged in industry affecting commerce who had fifteen or more employees and was an employer within the meaning of Title VII.

135. At all times relevant to this Complaint, Ms. Spitalnik was an employee of Defendant within the meaning of Title VII.

136. Ms. Spitalnik is a member of a protected class as she was a woman, was pregnant, suffered medical conditions related to childbirth, and gave birth.

137. Defendant took adverse actions against Ms. Spitalnik, as described above, including but not limited to demoting her, denying her leave, transferring her into an inferior asset leader role, and terminating her employment.

138. Defendant treated Ms. Spitalnik less favorably than similarly situated employees outside of her protected class and under circumstances giving rise to an inference of discrimination on the basis of sex.

139. Defendant's actions constitute discrimination on the basis of sex in violation of Title VII.

140. Defendant acted with malice and/or reckless indifference to Ms. Spitalnik's statutorily protected rights.

141. As a result of Defendant's violations, Ms. Spitalnik has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## COUNT II
## DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

142. Ms. Spitalnik realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

26

143. The Americans with Disabilities Act (ADA) prohibits an employer from discriminating against a qualified individual on the basis of disability in regard to the employee's terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a).

144. McKinsey is an "employer" within the meaning of the ADA, and Ms. Spitalnik was an "employee" within the meaning of the ADA.

145. Ms. Spitalnik had a disability within the meaning of the ADA as she suffered from mental health conditions, including acute stress disorder and post-traumatic stress disorder, which caused her heightened stress, anxiety, self-doubt, episodes of dissociation, forgetfulness, and difficulty with concentration and focus. This in turn substantially limited several of Ms. Spitalnik's major life activities, including concentrating, thinking, communicating, sleeping, and caring for herself. 42 U.S.C. § 12102(1)(A)-(2)(A).

146. Ms. Spitalnik was a qualified individual with a disability under the ADA, in that she was able to perform the essential functions of her job either with or without reasonable accommodations. 42 U.S.C. §§ 12111(4), (8).

147. Defendant was aware that Ms. Spitalnik was a qualified individual with a disability.

148. Defendant took adverse actions against Ms. Spitalnik, as described above, including when it transferred her into an inferior asset leader role and terminated her employment.

149. Defendant treated Ms. Spitalnik less favorably than similarly situated employees outside of her protected class and under circumstances giving rise to an inference of discrimination.

150. Defendant's actions constitute discrimination on the basis of disability in violation of ADA.

151. Defendant acted with malice and/or reckless indifference to Ms. Spitalnik's statutorily protected rights.

152. As a result of the Defendant's violations, Ms. Spitalnik has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## COUNT III
## FAILURE TO ACCOMMODATE UNDER THE PREGNANT WORKERS FAIRNESS ACT (PWFA)

153. Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count III of this Complaint.

154. The Pregnant Workers Fairness Act (PWFA) makes it unlawful for a covered employer to not make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee, unless the employer can demonstrate that doing so would impose an undue hardship on the operation of the business. 42 U.S.C. §§ 2000gg et seq.; 29 C.F.R. § 1636.3(h)-(j).

155. Leave, even extended leave, may be a reasonable accommodation under the PWFA. 29 C.F.R. § Pt. 1636, App. A, 43.

156. Further, "[a] qualified employee with a known limitation who is granted leave as a reasonable accommodation under the PWFA is entitled to return to their same position unless the employer demonstrates that holding open the position would impose an undue hardship." 29 C.F.R. § Pt. 1636, App. A, 62.

157. Defendant is a covered entity within the meaning of the PWFA because it is an employer engaged in industry affecting commerce and has over 15 employees. 42 U.S.C. §§ 2000gg(2)(B)(i), 2000e(b).

158. Ms. Spitalnik was a qualified employee, in that she, with or without reasonable accommodation, could perform the essential functions of her position and any inability to perform an essential function was temporary, could be reasonably accommodated, and such essential function could be performed in the near future. 42 U.S.C. 2000gg(6).

159. Ms. Spitalnik requested a reasonable accommodation related to pregnancy, childbirth, and related medical conditions, including when she requested leave in April 2023, and again in or around August 2023 and October 2023, following the birth and subsequent death of Sara Rose.

160. Defendant was aware that Plaintiff requested a reasonable accommodation related to pregnancy, childbirth, and related medical conditions.

161. While Defendant permitted Ms. Spitalnik to take leave, it violated the PWFA when it transferred her assets to other Solution Leaders and then demoted

her into a fundamentally different, and less desirable, Solution Leader role during the time that she was disabled from working by her pregnancy and related health conditions.

162.    Holding Ms. Spitalnik's position open until she returned from leave would not have been an undue hardship on Defendant.

163.    Defendant acted with malice and reckless indifference to Plaintiff's rights under the PWFA.

164.    As a result of the Defendant's violations, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

<u>COUNT IV</u>
**RETALIATION IN VIOLATION OF TITLE VII**

165.    Ms. Spitalnik realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count IV of this Complaint.

166.    Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended, makes it unlawful to retaliate against individuals who oppose practices that violate Title VII. 42 U.S.C. § 2000e-3(a).

167.    Ms. Spitalnik engaged in protected activity by asserting her rights under Title VII and opposing treatment that she reasonably believed constituted unlawful discrimination under Title VII, including in her October 20, 2023 conversation with Metakis; when she, through counsel, raised concerns regarding discrimination on the basis of pregnancy on January 23, 2024; when she filed a

charge with the EEOC on May 30, 2024 alleging the same; when she expressed concerns about discrimination and retaliation in her January 24, 2025, email to Rashid, Metakis, Loroi; and when she filed a subsequent charge with the EEOC on May 9, 2025, making additional allegations of discrimination.

168. Defendant took adverse actions against Ms. Spitalnik as a result of her protected activities, including when it transferred her into an inferior asset leader role and terminated her employment.

169. Defendant acted with malice and/or reckless indifference to Ms. Spitalnik's statutorily protected rights.

170. As a result of the Defendant's violations, Ms. Spitalnik has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## COUNT V
## RETALIATION IN VIOLATION OF
## THE AMERICANS WITH DISABILITIES ACT

171. Ms. Spitalnik realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count V of this Complaint.

172. The Americans with Disabilities Act prohibits employers from retaliating against employees for engaging in protected activity under the statute. 42 U.S.C. § 12203(a). "Protected activities under the ADA include either seeking an accommodation or raising a claim of discrimination due to ... disability." *Brown v.*

*BioLife Plasma LLC*, No. 24-CV-4371, 2025 WL 832956, at *5 (N.D. Ill. Mar. 16, 2025) (internal quotations omitted).

173.     Ms. Spitalnik engaged in activity protected under the ADA when she requested reasonable accommodations, including but not limited to her requests on or around April 16, 2023, August 17, 2023, August 28, 2023, and July 22, 2024.  Ms. Spitalnik also engaged in protected activity under the ADA when she raised concerns about discrimination on the basis of disability, including in her October 2023 conversation with Metakis; through counsel in her January 23, 2024 letter to McKinsey; in her January 24, 2025, email to Rashid, Metakis, Loroi; and in her EEOC charges filed on May 30, 2024, and May 9, 2025.

174.     Defendant was aware of her protected activities and took adverse actions against Ms. Spitalnik as a result of her protected activities including but not limited to demoting her, denying her leave, transferring her into an inferior asset leader role and terminating her employment.

175.     Defendant either knew that its actions violated the ADA or acted with reckless disregard as to whether its actions violated the ADA, making its violations willful and not in good faith.

176.     As a result of Defendant's violations, Ms. Spitalnik has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## COUNT VI
## RETALIATION UNDER THE PREGNANT WORKERS FAIRNESS ACT (PWFA)

177.   Ms. Spitalnik realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count VI of this Complaint.

178.   The PWFA makes it unlawful for a covered employer to take adverse action in the terms, conditions, or privileges of employment against a qualified employee on account of the employee having requested or used a reasonable accommodation to the known limitations related to the pregnancy, childbirth, or related medical conditions of the employee.  42 U.S.C. §§ 2000gg-1(1)-(5).

179.   Ms. Spitalnik requested and used a reasonable accommodation (leave) for the known limitations related to her pregnancy, childbirth, and related medical conditions:  she requested (and took) leave starting April 26, 2023 through approximately August 28, 2023, for pregnancy related complications, birth, and subsequent related medical conditions, and subsequently requested (and took) additional leave for pregnancy related medical conditions following the death of Sara Rose including on approximately August 17, 2023, August 28, 2023, and July 22, 2024.

180.   Defendant was aware that Ms. Spitalnik requested and used a reasonable accommodation related to pregnancy, childbirth, and related medical conditions.

181.   Defendant violated the PWFA when it took adverse actions with respect to the terms, conditions, and privileges of Ms. Spitalnik's employment – including demoting her, denying her leave, passing her over for promotion to into

the Organizational Health Index Asset Leader role, and terminating her employment – on account of having requested and used these accommodations.

182.     Defendant acted with malice and reckless indifference to Ms. Spitalnik's rights under the PWFA.

183.     As a result of the Defendant's violations, Ms. Spitalnik has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

**COUNT VII**
**RETALIATION/DISCRIMINATION IN VIOLATION OF THE FAMILY MEDICAL LEAVE ACT (FMLA)**

184.     Ms. Spitalnik realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count VII of this Complaint.

185.     The FMLA, 29 U.S.C. § 2601 *et seq.*, requires employers to provide up to 12 weeks unpaid leave for employees who give birth to a child or who experience a serious health condition. 29 U.S.C. § 2612(a)(1)(A), (D).

186.     The FMLA makes it unlawful to retaliate against individuals who oppose practices that violate the FMLA. 29 U.S.C. § 2615(a). This prohibition includes making it unlawful to use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions. 29 C.F.R. § 825.22.

187.    Defendant is a covered employer under the FMLA because it engages in industry affecting commerce and has more than 50 employees. 29 C.F.R. § 825.104.

188.    Ms. Spitalnik was eligible for leave under the FMLA as she had worked full time and worked more than 1,250 hours for Defendant during the previous year and was employed at a works site where Defendant employed over 50 employees within 75 miles. 29 C.F.R. § 825.110(a).

189.    Ms. Spitalnik engaged in activity protected by the FMLA's anti-retaliation provision when she requested and took FMLA leave.

190.    Defendant took adverse actions against Ms. Spitalnik as a result of her protected activities including but not limited to demoting her, denying her leave, and terminating her.

191.    Defendant either knew that its actions violated the FMLA or acted with reckless disregard as to whether its actions violated the FMLA, making its violations willful and not in good faith.

192.    As a result of the Defendant's violations, Ms. Spitalnik has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

193.    Liquidated damages are appropriate because Defendant lacked any good-faith basis for taking adverse action against Ms. Spitalnik or believing that its conduct was legal. 29 U.S.C. § 2617(a)(1)(A)(iii).

## COUNT VIII
## INTERFERENCE IN VIOLATION OF THE
## FAMILY MEDICAL LEAVE ACT

194.    Ms. Spitalnik realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count VIII of this Complaint.

195.    The FMLA, 29 U.S.C. § 2601 *et seq.*, requires employers to provide up to 12 weeks unpaid leave for employees who give birth to a child or who experience a serious health condition. 29 U.S.C. § 2612(a)(1)(A), (D).

196.    The FMLA makes it unlawful for an employer to interfere with, restrain, or deny the exercise of, or the attempt to exercise any right provided under the FMLA. 29 U.S.C. § 2615(a)(1). Interference can include discouraging an employee from taking FMLA leave, failing to designate leave as FMLA, or using FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions. *See* 29 C.F.R. § 825.22.

197.    Defendant is a covered employer under the FMLA because it engages in industry affecting commerce and has more than 50 employees. 29 C.F.R. § 825.104.

198.    Ms. Spitalnik was eligible for leave under the FMLA as she had worked full time and worked more than 1,250 hours for Defendant during the previous year and was employed at a works site where Defendant employed over 50 employees within 75 miles. 29 C.F.R. § 825.110(a).

199.    Defendant took adverse actions against Ms. Spitalnik to interfere with her leave rights including but not limited to demoting her, denying her leave, and terminating her.

200.    Defendant either knew that its actions violated the FMLA or acted with reckless disregard as to whether its actions violated the FMLA, making its violations willful and not in good faith.

201.    As a result of the Defendant's violations, Ms. Spitalnik has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

202.    Liquidated damages are appropriate because Defendant lacked any good-faith basis for taking adverse action against Ms. Spitalnik or believing that its conduct was legal. 29 U.S.C. § 2617(a)(1)(A)(iii).

**COUNT IX**
**BREACH OF CONTRACT**

203.    Ms. Spitalnik realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count IX this Complaint.

204.    McKinsey's U.S. Parental Leave Policy—shared with Spitalnik on July 18, 2023, after the birth of her daughter—states that "[a]ll colleagues ... regardless of tenure or path and who work at least a 60% schedule, are eligible to take **11 weeks** of paid Parental Leave... following the birth or adoption of a child (including births via surrogacy)." Ex. A, *U.S. Parental Leave Policy* at 2 (original emphasis). The Policy also provides for the option of taking five additional weeks of PTO for all

employees, regardless of current PTO balance, plus four weeks of paid special birth leave for premature births.

205.    McKinsey's U.S. Parental Leave Policy, on its face, applies to all full-time employees who bear or adopt children while employed by McKinsey, and contains no exception for employees whose children die.

206.    The language of McKinsey's U.S. Parental Leave Policy was sufficiently clear to lead Ms. Spitalnik to reasonably believe that McKinsey was bound by the stated policy.

207.    Ms. Spitalnik satisfied all conditions precedent to McKinsey's performance under the contract.

208.    McKinsey breached the contract by refusing to provide Ms. Spitalnik parental leave benefits because her baby died.

209.    Ms. Spitalnik was injured by McKinsey's breach.

<u>**COUNT X**</u>
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

210.    Ms. Spitalnik realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count X of this Complaint.

211.    As described above, McKinsey engaged in extreme and outrageous conduct, including but not limited to: refusing its obligation to provide Ms. Spitalnik parental leave for the sole reason that her baby died; demoting her while she was on leave and grieving her child's death; pressuring her to return to work when it was aware that Ms. Spitalnik was grieving and psychologically distraught; forcing Ms. Spitalnik to navigate the bureaucratic morass of seeking short-term and long-term

38

disability; delaying its approval of her disability paperwork for many months until she hired counsel and threatened legal action; transferring her into an inferior asset leader role when an objectively superior one for which she was qualified existed; and terminating her employment on the date that would have been her child's second birthday.

212. McKinsey intended to cause Ms. Spitalnik extreme emotional distress or knew that there was at least a high probability that its conduct would inflict severe emotional distress.

213. McKinsey's conduct in fact caused Spitalnik severe and extreme emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Spitalnik respectfully requests that this Court find in her favor and against Defendant as follows:

a. Declare that the acts and conduct of Defendant are unlawful and violate Title VII, the ADA, the PWFA, and the FMLA;

b. Award Ms. Spitalnik the value of all compensation and benefits lost to date (backpay) as a result of Defendant's unlawful conduct;

c. Reinstate Ms. Spitalnik to her position, or, in lieu of reinstatement, award Ms. Spitalnik the value of all compensation and benefits she will lose in the future (front pay) as a result of Defendant's unlawful conduct;

d. Award Ms. Spitalnik damages for breach of contract;

e.     Award Ms. Spitalnik compensatory damages, including but not limited to damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of reputation, and other non-pecuniary losses;

f.     Award Ms. Spitalnik damages for pain and suffering for Intentional Infliction of Emotional Distress;

g.     Award Ms. Spitalnik liquidated damages under the Family Medical Leave Act;

h.     Award Ms. Spitalnik punitive damages due to Defendant's malicious conduct and/or Defendant's reckless or callous indifference to the statutorily protected rights of Ms. Spitalnik;

i.     Award Ms. Spitalnik prejudgment interest;

j.     Award Ms. Spitalnik attorneys' fees, costs, and disbursements; and

k.     Award Ms. Spitalnik such other make whole equitable, injunctive, and legal relief as this Court deems just and proper.

## JURY DEMAND

Ms. Spitalnik demands a trial by jury on all issues of fact and damages triable in this action.

Respectfully submitted,


*/s/ Adam Herzog*

**KATZ BANKS KUMIN LLP**
Adam Herzog (IL Bar No. 6283084)
Colleen Coveney*
Katherine Wutchiett*
11 Dupont Circle
Suite 600
Washington, DC 20009
Phone: (202) 299-1140
Fax: (202) 299-1148
Herzog@katzbanks.com
Coveney@katzbanks.com
Wutchiett@katzbanks.com

*Pro hac vice forthcoming


**MATT SINGER LAW, LLC**
Matthew J. Singer (IL Bar No. 6310185)
77 W. Wacker Dr., Suite 4500
Chicago, Illinois 60601
Phone: (312) 248-9123
Matt@MattSingerLaw.com